779 N.W.2d 602 (2009)
18 Neb. App. 176
In re Interest of T.T., a child under 18 years of age.
State of Nebraska, appellee,
v.
S.Q. and A.Q., appellants.
No. A-09-244.
Court of Appeals of Nebraska.
December 8, 2009.
*609 Christopher A. Furches, of Furches Law Office, and David P. Kyker, Lincoln, for appellants.
Sarah E. Sujith, Special Assistant Attorney General, for appellee.
SIEVERS and CASSEL, Judges.
SIEVERS, Judge.
This appeal involves a 17-year-old youth, T.T., who was left by his parents at a Lincoln, Nebraska, hospital under a previous version of Nebraska's "Safe Haven" law. The mother and stepfather, S.Q. and A.Q., respectively, whom we generally reference throughout as "the parents," appeal from the decision of the separate juvenile court of Lancaster County prohibiting them from disclosing to the public specified information concerning T.T., his medical condition, and his treatment (the gag order), as well as from the court's order that they participate in a pretreatment assessment. We conclude that the gag order cannot survive constitutional scrutiny, and we reverse, and vacate that portion of the juvenile court's order.

FACTUAL AND PROCEDURAL BACKGROUND
S.Q. is T.T.'s biological mother, and A.Q. is T.T.'s stepfather. On October 28, 2008, S.Q. and A.Q. took 17-year-old T.T. to a hospital in Lincoln, invoked Nebraska's Safe Haven law, and left him there. The version of Nebraska's Safe Haven law in effect on October 28 stated in part: "No person shall be prosecuted for any crime based solely upon the act of leaving a child in the custody of an employee on duty at a hospital licensed by the State of Nebraska." Neb.Rev.Stat. § 29-121 (Reissue 2008). We note that § 29-121 has since been amended, although the changes are not germane to this appeal.
The State filed an amended petition on October 29, 2008, alleging that T.T. was a child as defined by Neb.Rev.Stat. § 43-247(3)(a) (Reissue 2008) because he was "in a situation dangerous to [his] life or injurious to [his] health or morals" in that on October 28, S.Q. and A.Q. left him at the hospital under Nebraska's Safe Haven law. A motion for temporary custody was filed and granted that same day. T.T. has been in the custody of the Nebraska Department of Health and Human Services (DHHS) since that time. DHHS eventually placed T.T. with relatives.
At a hearing on November 24, 2008, S.Q. entered an admission to the allegations of the amended petition. A.Q. made no objection to the juvenile court's accepting the admission and taking jurisdiction in the matter. By an order filed by the juvenile court on November 26, T.T. was adjudicated to be within the meaning of § 43-247(3)(a) because he was "in a situation *610 dangerous to [his life] or injurious to [his] health or morals." Also pursuant to the November 26 order, S.Q. and A.Q. were ordered to "not discuss past and ongoing medical treatment of [T.T.] with the public"the court designated this portion of the order as the "additional temporary order." The record before us does not indicate at whose instance this gag order was entered.
On December 10, 2008, DHHS filed a motion to clarify or amend the November 26 order. On December 11, S.Q. and A.Q. filed a motion to modify the temporary order. After a hearing on December 30 on these motions, the court's order was filed on January 2, 2009. In that order, the juvenile court stated:
Although disposition has not been entered, it is reasonable to assume that reunification will be the permanency goal in this case. [DHHS] is already providing therapeutic visitation between [T.T.] and his parents to work on the problems in their relationship and both [T.T.] and his mother have indicated a desire for further contact. Release of private, sensitive information regarding [T.T.] must be considered in light of the probable goal of reunification and [T.T.'s] best interest. Any further public disclosure by the parent of private medical information to the public would jeopardize the efforts being made to effect reconciliation and reunification between [T.T.] and his parent and would be harmful to [T.T.'s] best interest, both in the long term and short term.
The juvenile court found that it was in T.T.'s "best interest and it is in furtherance of efforts at reunification" that specific guidelines be given regarding disclosure or release of T.T.'s medical information to the public. The juvenile court therefore ordered:
[T]here will be no further public disclosure by the parents of [T.T.'s] private medical information: [T.T.'s] full, legal name; [T.T.'s] date of birth; his social security number; any specific diagnosis that he has been given; any medication he has been prescribed; names of any providers of treatment to [T.T.] and type of treatment provided.
In a disposition order filed on February 3, 2009, the juvenile court stated that the primary permanency plan for T.T. was "Independent Living" with an alternative plan of "Self Sufficiency." Once again the juvenile court ordered:
There will be no further public disclosure by the parents of [T.T.'s] private medical information: [T.T.'s] full, legal name; [T.T.'s] date of birth; his social security number; any specific diagnosis that he has been given; any medication he has been prescribed; names of any providers of treatment to [T.T.] and type of treatment provided.
Hereafter, we will generally reference these two orders by the term "gag order," the common colloquial phrase used to describe orders restricting disclosure or speech. The juvenile court also ordered S.Q. and A.Q. to "participate in a pretreatment assessment and sign releases of information so that [DHHS] can provide documents to the evaluator." S.Q. and A.Q. now appeal from the district court's February 3 order.

ASSIGNMENTS OF ERROR
S.Q. and A.Q. allege that the juvenile court erred in (1) violating their rights to free speech and (2) ordering them to submit to a pretreatment assessment when the permanency objective was independent living and not reunification.

STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court *611 is required to reach a conclusion independent of the juvenile court's findings. In re Interest of Laurance S., 274 Neb. 620, 742 N.W.2d 484 (2007).

ANALYSIS

Jurisdiction Over Gag Order of February 3, 2009.
In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. In re Interest of Taylor W., 276 Neb. 679, 757 N.W.2d 1 (2008). Additionally, DHHS has moved to dismiss the appeal because the order of January 2, 2009, contained an identical gag order and was a final, appealable order but the notice of appeal was not filed until February 27, more than 30 days after the January 2 order, and thus, the appeal was filed out of time. We notified the parties that we would not rule on the motion to dismiss until after oral argument and submission of the case for decision.
We begin our jurisdictional analysis by noting that the juvenile court's order of February 3, 2009, is an "Order of Disposition" and that such orders of the juvenile court are final, appealable orders. See In re Interest of Clifford M. et al., 6 Neb.App. 754, 577 N.W.2d 547 (1998). But here, the State asserts that both of the parents' assignments of error involve matters over which we have no jurisdiction even though this appeal was filed within 30 days of the February 3 order. It is well known that in order for an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. In re Interest of Michael U., 273 Neb. 198, 728 N.W.2d 116 (2007). Conversely, an appellate court is without jurisdiction to entertain appeals from nonfinal orders. See id. While there are three types of final orders defined by Nebraska law, we find that the jurisdictional issue here centers on the second of the three types of appealable ordersan order affecting a substantial right made during a special proceeding. See In re Estate of Rose, 273 Neb. 490, 730 N.W.2d 391 (2007). See, also, Neb.Rev. Stat. § 25-1902 (Reissue 2008).
There is no doubt that a proceeding before a juvenile court is a "special proceeding" for appellate purposes. See In re Interest of Walter W., 274 Neb. 859, 744 N.W.2d 55 (2008). Thus, the jurisdictional issue concerning the gag order is resolved by determining whether the January 2, 2009, order affects a substantial right as that concept has been articulated under Nebraska law. The analysis of this issue is undertaken against the backdrop that the language in the gag orders of January 2 and February 3 is identical, a fact which necessarily involves application of the continuing order doctrine detailed in Federal Land Bank v. McElhose, 222 Neb. 448, 384 N.W.2d 295 (1986). In McElhose, the Nebraska Supreme Court held that when a court's order is already in place and a subsequent order merely extends the time that the previous order is applicable, the subsequent order does not extend the time in which the original order may be appealed. This concept has been extended to juvenile cases, and the Supreme Court has said that the subsequent order does not by itself affect a substantial right. See In re Guardianship of Rebecca B. et al., 260 Neb. 922, 621 N.W.2d 289 (2000). The Supreme Court has reasoned that an appeal from a subsequent order that merely continues the effectiveness of a prior order is an impermissible collateral attack on the previous order. In re Interest of Sarah K., 258 Neb. 52, 601 N.W.2d 780 (1999). Thus, at first blush it appears *612 that the parents had to appeal within 30 days of the January 2 gag order because the February 3 order merely continues the previous order, using identical language. This is the essence of the State's argument asserted in the motion to dismiss, that we lack jurisdiction.
However, the parents counter that the January 2, 2009, order was merely a "temporary order" and that it is the February 3 order that affected a substantial right under our jurisdictional jurisprudence. Accordingly, we must delve deeper into the nature of a substantial right.
A substantial right is an essential legal right, not a mere technical right. In re Guardianship of Sophia M., 271 Neb. 133, 710 N.W.2d 312 (2006). A substantial right is affected if the order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to an appellant prior to the order from which an appeal is taken. Id., citing In re Guardianship & Conservatorship of Larson, 270 Neb. 837, 708 N.W.2d 262 (2006). The parents claim that the February 3, 2009, order affects a substantial right because the constitutional guarantee of free speech protects their right to publicly disclose the information about T.T. that is prohibited by the trial court's order of February 3.
In In re Interest of R.G., 238 Neb. 405, 470 N.W.2d 780 (1991), disapproved on other grounds, O'Connor v. Kaufman, 255 Neb. 120, 582 N.W.2d 350 (1998), the court said that the question of whether a substantial right of a parent has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the parent's relationship with the juvenile may reasonably be expected to be disturbed. And in In re Interest of Zachary W. & Alyssa W., 3 Neb.App. 274, 278, 526 N.W.2d 233, 237 (1994), an appeal involving grandparent visitation, we said that the order being appealed was of "sufficient importance and may reasonably be expected to last a sufficiently long period of time that the order affects a substantial right of [the parent]." Consequently, our analysis of the first gag order, of January 2, 2009, turns to (1) the object of the order and its importance and (2) the timeframe over which the order can reasonably be expected to operate.
The object of the gag order is clearly to restrain the parents' constitutional right of free speech. The right of free speech is "constitutional bedrock" and a right by which other freedoms, such as assembly and free press, are given meaning and power. Therefore, the right which is the object of the gag order can hardly be considered a "mere technical right." The orders at issue are obviously a "prior restraint" on the parents' right of free speech, and while they are not unconstitutional per se, there is a "`heavy presumption'" against their constitutional validity. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Thus, we readily conclude that the object of the January 2, 2009, order is of "sufficient importance" under the continuing order doctrine to make it appealable.
We now turn to the second aspect of the substantial right analysisthe timeframe during which the January 2, 2009, order was expected to last. This portion of the analysis requires that we provide some context from the record concerning the entry of the court's order on that date.
Earlier, we alluded to the entry of the first gag order by the juvenile court on November 26, 2008. The November 26 gag order was worded substantially differently from the January and February orders. The parents and DHHS both found *613 the November order to be vague or overbroad and moved the court for modification of such so as to clarify what the parents could and could not disclose about T.T. A hearing was held December 30 on both motions. In this hearing, the mother, S.Q., explained that she wanted to participate in a state senator's task force examining the Safe Haven law and the availability of services for troubled youth, as well as be involved in a "support group" for parents of similarly situated youth. S.Q. testified that the gag order prevented her from, and we paraphrase, telling "her story" which is intertwined with "T.T.'s story." The evidence was that there was a "parents' roundtable" discussion as part of the senator's task force scheduled for January 5, 2009, in which S.Q. wanted to participate, but she did not want to violate the court's order by anything that she said. Evidence was adduced as to why the parents should be restricted in what they could say about T.T., but we need not discuss that evidence in our jurisdictional analysis. After the evidence had concluded, the juvenile court judge announced that she would issue her order "before the 5th, so [that the parents would] know what the guidelines are." And the court did as promised and issued the new and more refined gag order of January 2, which replaced the November order.
In considering the time over which the January 2, 2009, order could reasonably be expected to operate, it is important to note that this order was captioned by the court as, in part, "Order Continuing Temporary Orders; Notice of Dispositional Hearing." The January 2 order, after setting forth factual findings, was structured in five paragraphs. The first contained the gag order under discussion, and the second dealt with a visitation issue not of import in this appeal. We quote the next two paragraphs:
All temporary orders shall continue in full force and effect until further order of the Court.
Disposition on the Amended Petition is scheduled for January 7, 2009 at 3:00 p.m. at which time parties and counsel shall appear.
The parents argue that the quoted language limiting the effectiveness of the gag order "until further order of the Court" entered in the contextual framework of the upcoming public meeting on January 5, 2009, plus the pendency of the dispositional hearing on January 7 means that the gag order of January 5 could reasonably be expected to operate only for a brief period of time. In short, the parents assert that it was only a temporary order, and, as noted above, the juvenile court captioned it as such. An example where the burden of an order was blunted by its brief operative timeframe when considered in the context of the ongoing case so as to support the conclusion that it did not affect a substantial right is found in In re Guardianship of Sophia M., 271 Neb. 133, 710 N.W.2d 312 (2006). In In re Guardianship of Sophia M., the Supreme Court reasoned:
Here, the visitation order denied visitation pending the final guardianship hearing, which was scheduled to occur approximately 3 weeks later. The court explained that prior efforts to provide visitation had been unsuccessful and that, with only 3 weeks until the final guardianship hearing and a final resolution of the issue, very little would be gained by attempting to construct another visitation arrangement. Further, since the order effectively denied visitation only until the final guardianship hearing, the length of time that [the mother's] relationship with [the child] was to be disturbed was brief, and the order was not a permanent disposition. *614 The fact that [the mother's] appeal of the visitation order has delayed the final disposition of the guardianship proceeding is unfortunate but irrelevant in our determination whether the order, when issued, affected a substantial right. The visitation order did not affect a substantial right and is not a final, appealable order.
271 Neb. at 139, 710 N.W.2d at 317.
Following the reasoning of In re Guardianship of Sophia M., we conclude that while the January 2, 2009, order affected a matter of significance so as to be appealable, the timeframe during which it was intended to operate was only 5 days, until the scheduled dispositional hearing on January 7. Thus, the January 2 order, like the order in In re Guardianship of Sophia M., was a nonfinal order because of the brief timeframe during which it was intended to operate.
Although the January 7, 2009, dispositional hearing was actually continued until January 29, such fact does not affect our analysis or conclusion, because a litigant must be able to assess whether a court's order is appealable when it is entered, not by what happens in the case thereafter. Accordingly, we find that the gag order of January 2 was a temporary order that did not affect a substantial right and that the gag order found in the dispositional order of February 3 was a final, appealable order that was to remain in effect until the next hearing that the court scheduled, for August 7. Therefore, we have jurisdiction to consider the merits of the February 3 gag order, and the State's motion to dismiss the appeal is overruled.

Constitutionality of Gag Order.
The gag order contained within the juvenile court's dispositional order of February 3, 2009, is clearly a prior restraint on the parents' right of free speech. Although there is no Nebraska authority dealing with a parent's right to speak publicly about his or her minor child, the general constitutional principles relating to prior restraints of speech are well established.
Governmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated. City of Lincoln v. ABC Books, Inc., 238 Neb. 378, 470 N.W.2d 760 (1991). While prior restraints are not unconstitutional per se, they bear a "`heavy presumption'" against constitutional validity. J.Q. Office Equip. v. Sullivan, 230 Neb. 397, 399, 432 N.W.2d 211, 213 (1988), quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). "The Government `thus carries a heavy burden of showing justification for the imposition of such a restraint.'" New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (often and hereinafter cited as "The Pentagon Papers"). Any attempt to effect a prior restraint is subject to "exacting scrutiny." See Smith v. Daily Mail Publishing Co., 443 U.S. 97, 102, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979). Or, as stated in Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 842-43, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978):
Properly applied, the [application of exacting scrutiny] requires a court to make its own inquiry into the imminence and magnitude of the danger ... and then to balance the character of the evil... against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.
In The Pentagon Papers, the U.S. Supreme Court considered the constitutional validity of a restraining order against the publication of governmental *615 documents concerning the war in Vietnam. The government argued that harm to the national security interests of the United States justified the restraint against publication. One of several concurring opinions said:
[T]he First Amendment tolerates absolutely no prior judicial restraints ... predicated upon [the] surmise or conjecture that untoward consequences may result.... [O]nly governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence [of the danger identified] can support even the issuance of an interim restraining order. In no event may mere conclusions be sufficient....
403 U.S. at 725-27, 91 S.Ct. 2140 (Brennan, J., concurring) (emphasis supplied). Thus, it is apparent that the "bar" to sustain a prior restraint is high.
There are a number of reported decisions from other jurisdictions involving judicial restrictions on dissemination of information about a juvenile court proceeding or the juvenile involved in such proceeding. Often such cases involve closure of the juvenile court proceedings or restrictions on what the media may publish, e.g., In re T.R., 52 Ohio St.3d 6, 556 N.E.2d 439 (1990) (case involving surrogate parenting agreement, closed court proceeding, and gag order on parties and their attorneys). In In re T.R., the Ohio Supreme Court found that the standards used by the trial court for the imposition of the restraints, "`scintilla of possibility of harm'" and "`best interests of the child,'" were incorrect. 52 Ohio St.3d at 18, 556 N.E.2d at 451. The Ohio court reasoned that given the juvenile court's history of confidentiality, it is possible to reasonably argue that public access is never in the child's best interests, but that the standards used by the trial judge gave insufficient weight to the public's interest in access to workings of the juvenile court and in scrutinizing such.
Gag orders have been held to be a less restrictive alternative to restrictions imposed on the media. See Nebraska Press Assn. v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). But this appeal does not involve courtroom closure or restrictions on the media. In the Ohio case, In re T.R., discussed above, the court held that "a juvenile court, which is not presumptively open, has the power to control extrajudicial comments by the litigants, provided the restrictions are consistent with [constitutional] standards ...." 52 Ohio St.3d at 21, 556 N.E.2d at 454. The Ohio court also noted that prior restraints have been used to attempt to protect the privacy interests of parties to "sensational cases." Id., citing S.N.E. v. R.L.B., 699 P.2d 875 (Alaska 1985) (child custody case involving lesbian mother where gag order was found to be overbroad), and Mason v. Reiter, 531 So.2d 348 (Fla.App.1988) (contempt citation for violation of gag order in case involving famous comedian held technically defective). In the Alaska case, S.N.E. v. R.L.B., supra, a blanket prohibition against all communications with persons not specified in the order was held to be unconstitutionally overbroad. In In re Dependency of T.L.G., 139 Wash.App. 1, 20, 156 P.3d 222, 232 (2007), the trial court's gag order prohibiting the father from disseminating any documents, reports, and orders without permission of the court and of the children's guardian ad litem was found overbroad and the matter was remanded to "[determine] whether a protective order [was] necessary and, if so, enter a new order that is consistent with [the father's] constitutional and statutory rights." Although in the present case, the juvenile court's gag order is more narrowly tailored, these cases illustrate the exacting *616 scrutiny restrictive orders on speech and freedom of the press are to receive.
In State ex rel. L.M., 37 P.3d 1188 (Utah App.2001), the trial court's gag order prohibited all involved parties from discussing the case with the media. The Utah court, after citation of many of the First Amendment principles we have outlined above, said that the State had to present evidence of some compelling interest that would be endangered without the limitation on speech. The Utah court found that the State had a compelling interest in maintaining the confidentiality of juvenile court proceedings, which confidentiality normally serves the best interests of children involved in such proceedings. Nonetheless, the Utah court could find no evidence in the record that the juvenile court properly discharged its duty to
(1) clearly identify "the imminence and magnitude of the [possible] danger," Landmark Communications [, Inc. v. Virginia, 435 U.S. 829, 843, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978)]; (2) balance the parties' interests to determine whose interest deserved the greater protection; and (3) if the court determined that the State's interests in protecting [the child at issue] deserved the greater protection,... either (a) explore other possible measures, or (b) narrowly draft the gag order to ensure that it was no more restrictive than necessary to protect the compelling interests. See id.; see also Procunier [v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)].
State ex rel. L.M., 37 P.3d at 1195. Therefore, the juvenile court's gag order was vacated, and on remand, the juvenile court was to conduct a "proper inquiry into the government's interests and balance the imminence and magnitude of the danger presented against [the parents'] right to free and unfettered expression." Id. at 1196.
In the Illinois case In re J.S., 267 Ill.App.3d 145, 640 N.E.2d 1379, 204 Ill. Dec. 30 (1994), the mother filed an interlocutory appeal of a gag order in a child custody dispute that resulted in the state's filing a petition to declare the minor child neglected. The gag order in In re J.S. prohibited the parties and their attorneys from discussing the underlying case with members of the news media. The court, while acknowledging the presumption of invalidity of a prior restraint on speech, said that "`a judicial order restraining speech will not be held invalid as a prior restraint if it is: (1) necessary to obviate a "serious and imminent" threat of impending harm, which (2) cannot adequately be addressed by other, less speech-restrictive means.'" 267 Ill.App.3d at 148, 640 N.E.2d at 1382, 204 Ill.Dec. at 33, quoting In re A Minor, 127 Ill.2d 247, 537 N.E.2d 292, 130 Ill.Dec. 225 (1989) (Minor I). However, the court distinguished Minor I because the child in In re J.S. was an innocent victim, not a juvenile criminal suspect as in Minor I, and because in Minor I, the appellant was a news organization seeking to print information it deemed newsworthy. The court in In re J.S. then turned to another decision of the Illinois Supreme Court, In re A Minor, 149 Ill.2d 247, 595 N.E.2d 1052, 172 Ill. Dec. 382 (1992) (Minor II), which involved a gag order against a newspaper that wanted to print the identities of child victims of sexual and physical abuse. The newspaper had secured the identities through court proceedings rather than by its own journalistic efforts. The Minor II court found:
[T]he State has an interest in the nondisclosure of the minor victims' identities in its role as parens patriae. It was in its role as parens patriae that the State initiated these juvenile proceedings to provide shelter and care for these abused children. The minor victims *617 reside and will continue to reside in a small community. Public identity could cause continuing emotional trauma to these unfortunate children and impede the lengthy and difficult healing process which they must endure. We find that the danger of public disclosure and the probability of irreparable adverse effects which such disclosure would entail to be a compelling State interest at stake in this case.
Coupled with the State's interest in nondisclosure, we find that the minor victims themselves have a compelling interest at stake in this case.
149 Ill.2d at 255, 595 N.E.2d at 1056, 172 Ill.Dec. at 386. The court in Minor II emphasized, however, that the children's and the State's compelling interests in nondisclosure must be weighed against "`the need for free and unfettered expression.'" 149 Ill.2d at 257, 595 N.E.2d at 1056, 172 Ill.Dec. at 386, quoting Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978).
However, Minor II is not a gag order case in the same sense as the matter before us. Rather, it involves an order which prohibited a newspaper from disclosing the identities of minor victims of physical and sexual abuse which had been obtained in the course of court proceedings. The Illinois Supreme Court concluded that a section of Illinois' Juvenile Court Act authorizing the juvenile court to prohibit newspapers from disclosing the identities of minors who are victims of sexual crimes was not an unconstitutional prior restraint on freedom of the press. The Minor II court further held that the danger of public disclosure and probability of irreparable adverse effects of such disclosure constituted a compelling state interest, in addition to the minors' own compelling interest in freedom from invasion of their privacy. In the end, the Illinois court concluded that the First Amendment role of the media was not diminished by withholding the names of the juvenile victims.
We digress to note that the Nebraska Constitution does not contain an express right of privacy as does the Illinois Constitution. See Ill. Const. art. I, § 6. See, also, Ill. Const. art. I, § 12. In State v. Senters, 270 Neb. 19, 699 N.W.2d 810 (2005), our Supreme Court held that the due process clause of the Nebraska Constitution does not contain a right of privacy broader than that recognized under the federal Constitution. See, also, Hamit v. Hamit, 271 Neb. 659, 715 N.W.2d 512 (2006). And we have found no authority holding that the federal Due Process Clause protects the anonymity of a juvenile involved in court proceedings.
Returning to In re J.S., 267 Ill.App.3d 145, 640 N.E.2d 1379, 204 Ill.Dec. 30 (1994), the underlying litigation was between the parents over custody of the child. The mother alleged that the father had subjected the child to sexual abuse, and she wanted to discuss the case with the media, although there was no evidence that the media was interested in the case. In upholding the gag order, the In re J.S. court reasoned:
We fail to comprehend how the mother could discuss with the news media the scandalous, horrendous details of sexual abuse that she alleges occurred while keeping confidential the identity of the alleged victim. Under the facts of this case, we believe that the trial court was correct to protect [the child's] anonymity and that it used the order with sufficient restraint that constitutionally protected speech was not unduly burdened.
267 Ill.App.3d at 154, 640 N.E.2d at 1385-86, 204 Ill.Dec. at 36-37. However, the case before us involves not a juvenile *618 victim of sexual or physical abuse, but, rather, a youth who has behavioral issues at home, in school, and at worknot uncommon issues with some youthwhich do not connote the same need for protection as is present with a minor who is a victim of sexual crimes. Thus, the considerations in In re J.S. which supported the imposition of the gag order therein are not present here.
With the foregoing discussion of pertinent constitutional principles and representative cases from other jurisdictions in mind, we turn to the specifics of the gag order before us. The bill of exceptions before us contains the hearing on the motions of the parties to clarify and limit the November 26, 2008, gag order, but not the hearing when that original order was entered. Nonetheless, we can surmise from the record we do have that the November 26 gag order arose from the publication of an article in the Wall Street Journal about T.T. and Nebraska's then-existing Safe Haven law. However, the Wall Street Journal article is not in our record.
T.T.'s therapist testified that T.T. expressed anger and embarrassment at having his personal information in the media, but that it had not interfered with his treatment. However, according to the therapist, T.T. had had issues since the article came out with resulting "somatoform problems" such as sleep problems, increased acne, and increased anger. The therapist testified that dealing with the anger and embarrassment had become a "central theme of [T.T.'s] therapy quite often." In the therapist's opinion, disclosure of last name, date of birth, Social Security number, types of treatment, diagnosis, and treatment providers should be restricted because such were "things that could be detrimental to a person's future or self-esteem." During the cross-examination of the therapist, it was suggested that previous medical records (which the therapist admitted she had not gotten) revealed that T.T.'s sleep problems and acne predated the Wall Street Journal article. We note that exhibits included in our record from the dispositional hearing of January 29, 2009, clearly support the conclusion that T.T. had difficulties with sleep and, by inference, acne, before the publication of the Wall Street Journal article.
The therapist testified that among T.T.'s concerns are the fact that an Internet search will bring up T.T.'s name and the Wall Street Journal article; the fact that S.Q., his mother, provided information to a reporter on how to contact him; and the fact that the reporter did try to reach him. The therapist stated that T.T. also told her the article had misinformation about him. The therapist said that in a therapy session involving T.T. and S.Q., the article and his anger at S.Q. were discussed, and that T.T. and S.Q. "are making progress with it." The therapist acknowledged that the parents related during therapy that their intent in providing information for the Wall Street Journal article was not to hurt or embarrass T.T., but to help others in similar situations. The therapist said that T.T. has resolved his negative feelings about that past occurrence, but that he was skeptical about the expressed motivation of the parents. The therapist further testified that T.T. told her that he felt it was intended to hurt and embarrass him and that he would be upset if new attempts to disclose information about him were made. The therapist agreed with T.T.'s guardian ad litem that disclosure of protected health information could impact T.T.'s future insurability, employability, or admission to college or the military.
Included in evidence is the therapist's progress note from a family therapy session of December 12, 2008, and we quote *619 the portion thereof relevant to the issue before us:
[T.T.] confronts his mom re Wall Street [Journal] article, said it "totally exposed me, embarrassed me". Mom discusses why she did thisout of frustration. Mom asks "is there anything in that article that anyone didn't know already?" Mom said the article was meant to draw attention to loopholes in Nebr. carenot to hurt [T.T.] Family asks how [T.T.] was introduced to Wall Street [Journal] article and th[e] therapist explained that [the therapist's DHHS supervisor] asked her to help [T.T.] understand. [T.T.] cont. to assert that the article felt negative to him and very critical. Mom asks him to try looking at article from a different angle Sister ... said she talked to reporters for an hour trying to "help all the other kids out there". [T.T.] cont[.] to assert why nothing positive was forthcoming.
T.T.'s mother, S.Q., testified that she did not intend to harm or embarrass her son and that her goal was to help others who were in similar situations with their children and struggling to get services and assistance for them. And she wanted to be able to participate in the policy discussions with a state senator's Safe Haven law task force and the associated "parents' roundtable" discussion that was to occur on January 5, 2009. She testified that she was willing not to use T.T.'s name in any of such endeavors, but that T.T.'s history was a part of that process. S.Q. testified that her son had a long history of "mental health issues" and that the only reason she wanted the language from the November 26, 2008, order removed was so that she could participate in the state senator's task force. In evidence is a letter of December 17 from T.T.'s therapist to her supervisor, stating:
[T.T.] has reported feeling strongly "embarrassed and angry" by this having been publicized by his parents.
[T.T.] is a young man dealing with issues of self-esteem, anger towards his parents (on both sides) and reported somatoform reactions related to the stress from this particular situation. I do not believe it is in [T.T.'s] best interest to have additional protected health information disseminated to the general public. In therapy, this situation continues to be central and of trouble to [T.T.]
The therapist's supervisor's affidavit of December 18, 2008, is in evidence, and it recounts that in a meeting with T.T. the previous day, she asked him about the Wall Street Journal article and he told her that he was pretty much "`over it,'" as it had been several weeks and he had had time to process his feelings. The supervisor then related that she inquired about how he would feel if there were an additional release of information about him to the public, to which he responded, "`I know that won't happen because you will protect me'" and "`I don't want any other information going out to people about me.'" The supervisor also included in her affidavit that she had talked with the people with whom T.T. was placed in foster care and that they told her that on "numerous occasions," he has stated that he wants this to be a "`family issue.'" No one testified about any physical or emotional harm that would come to T.T. from additional public disclosure of information that would be above and beyond what he has already experienced as a result of the Wall Street Journal article.
The juvenile court's first iteration of the gag order under consideration was entered January 2, 2009, after the evidence we have summarized above was adduced. The order made the following finding: "[F]urther public disclosure of [T.T.'s] private *620 medical information is contrary to his best interest. It is in [T.T.'s] best interest and it is in furtherance of efforts at reunification that specific guidelines be given regarding disclosure of or release of [T.T.'s] medical information to the public."
We do not disagree with the juvenile court's conclusion that further disclosure of T.T.'s private medical information is not in T.T.'s best interests, because we think the evidence recited above makes that conclusion inescapable. However, the fundamental difficulty is that the child's best interests are not the standard, nor does the juvenile court's rationale for the entry of the gag order comport with the established law allowing the lawful entry of a judicial order imposing a prior restraint on speech. The law is clear that our obligation is to subject a prior restraint on free speech to "exacting scrutiny" and that such restraints begin with a "heavy presumption" of unconstitutionality. When we scrutinize the gag order, remembering that it is the State's "heavy burden" to justify the restraint, we must assess "the imminence and magnitude of the danger ... and then ... balance the character of the evil ... against the need for free and unfettered expression." Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). And in this case, the evidence is that the parents wish to exercise their right of free speech in the arena where public policy is formed, rather than merely for their own personal ends. Given the applicable legal principles regarding prior restraints on speech, we hold that a restraint on speech against disclosure to the public of information about a juvenile because it is in the juvenile's "best interest," as the juvenile court found, is an insufficiently justified prior restraint on speech. We now turn to the danger or harm to T.T. and its imminence.
No witness testified that further disclosure posed imminent physical or emotional harm or danger to T.T. of any magnitude. The record clearly supports the conclusion that if T.T.'s parents make further public disclosure about him, his past difficulties, or his treatment, T.T. will likely be angry and embarrassed, plus reconciliation with his family will be more difficult. On the other hand, we remember that the evidence shows he is "over it" with respect to the Wall Street Journal article. And, as said in The Pentagon Papers, a prior restraint on speech cannot be predicated on "surmise or conjecture that untoward consequence may result." 403 U.S. at 725-26, 91 S.Ct. 2140. Moreover, while we do not know exactly what was disclosed in the Wall Street Journal article, it is a permissible inference that at least some of the information restricted by the gag order is already in the public domain. Thus, this factor reduces the effectiveness of the gag order, as well as undercuts any claim that the danger of harm is imminent.
The parents are obviously now aware of how T.T. feels about their prior disclosures about him in the Wall Street Journal article and that he, quite understandably, wants his difficulties to be a "family issue." Whether the parents are acting in his best interests by further disclosure is not the standard by which we judge the gag order. Nonetheless, we cannot help but observe that the parents can be meaningfully involved in the public policy discussions in which they are interested while simultaneously striving to minimize discussion of specific medical information about T.T. Moreover, the juvenile court can address future parental actions which are not in T.T.'s best interests because there are remedies within the juvenile system in the event of future parental actions that are not in a child's best interests. The availability *621 of such future remedies would be "other measures that will serve the State's interests [that] should also be weighed." See Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). Having said this, we must acknowledge the tension between the parents' right to speak about T.T., although doing so is not in his best interests, and our often-stated doctrine that the juvenile court need not wait for disaster to befall a minor child before acting. See In re Interest of Joshua M. et al., 4 Neb.App. 659, 548 N.W.2d 348 (1996), reversed in part on other grounds, 251 Neb. 614, 558 N.W.2d 548 (1997). But, that doctrine has never been applied in the context of a gag order on parents involved in the juvenile system.
In the end, we must conclude that the evidence is simply insufficient, absent conjecture and speculation which we cannot engage in, to satisfy the State's heavy burden to justify this prior restraint on free speech and to overcome the heavy presumption of unconstitutionality of a prior restraint on speech. There is no evidence proving imminent harm to T.T. of a magnitude that justifies a prior restraint on free speech. Therefore, we vacate that portion of the juvenile court's order of February 3, 2009, preventing the parents from disclosing information about T.T.

Pretreatment Assessment.
S.Q. and A.Q. argue that the juvenile court also erred in ordering them to submit to a pretreatment assessment when the permanency objective was independent living and not reunification. Once again, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. In re Interest of Taylor W., 276 Neb. 679, 757 N.W.2d 1 (2008); In re Interest of Anthony R. et al., 264 Neb. 699, 651 N.W.2d 231 (2002).
The State cites to Neb.Rev.Stat. § 43-287.01 et seq. (Reissue 2008) and In re Interest of Laura O. & Joshua O., 6 Neb.App. 554, 574 N.W.2d 776 (1998), in support of its argument that the juvenile court review panel is the only avenue for review in situations where a dispositional order is entered which differs from the plan of DHHS and where the party seeking review believes that the court-ordered plan is not in the best interests of the juvenile. We agree that is the law.
The State argues that the court order differed from DHHS' recommendation in that the juvenile court did not order the recommended psychological evaluation. A side-by-side comparison of DHHS' plan and the court order supports the State's argument to a degree. DHHS' case plan of January 22, 2009, recommended that S.Q. and A.Q. "participate in psychological evaluations." And the juvenile court ordered that S.Q. and A.Q. "shall participate in a pretreatment assessment." However, the State forgets that at the January 29 hearing, DHHS stated it would be agreeable to have the parents undergo a pretreatment assessment, rather than a psychological evaluation, and that DHHS stated it did not have "any problems" amending its recommendation. Because the court order was consistent with the ultimate recommendations by DHHS to the juvenile court, S.Q. and A.Q. were not required to appeal to the juvenile review panel pursuant to § 43-287.01. Because we have jurisdiction over the issue, we now address the meritswhether the juvenile court's order requiring S.Q. and A.Q. to participate in a pretreatment assessment was appropriate.
Once a plan of reunification has been ordered to correct the conditions underlying the adjudication under § 43-247(3)(a), *622 the plan must be reasonably related to the objective of reuniting the parents with the children. In re Interest of Mainor T. & Estela T., 267 Neb. 232, 674 N.W.2d 442 (2004). In In re Interest of J.S., A.C, and C.S., 227 Neb. 251, 268, 417 N.W.2d 147, 158 (1987), the Nebraska Supreme Court said:
Materiality of a provision in a court-ordered rehabilitative plan is determined by a cause-and-effect relationship: Does a provision in the plan tend to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code? An affirmative answer to the preceding question provides the materiality necessary in a rehabilitative plan for a parent involved in proceedings within a juvenile court's jurisdiction. Otherwise, a court-ordered plan, ostensibly rehabilitative of the conditions leading to an adjudication under the Nebraska Juvenile Code, is nothing more than a plan for the sake of a plan, devoid of corrective and remedial measures.
The reasonableness of a rehabilitative plan for a parent depends on the circumstances in a particular case and, therefore, is examined on a case-by-case basis. Id. S.Q. and A.Q. argue that their participation in a pretreatment assessment is not reasonably related to the permanency objective identified in DHHS' plan, such being independent living.
The Nebraska Juvenile Code must be liberally construed to accomplish its purpose of serving the best interests of the juveniles who fall within it. In re Interest of R.A. and V.A., 225 Neb. 157, 403 N.W.2d 357 (1987), overruled on other grounds, State v. Jacob, 242 Neb. 176, 494 N.W.2d 109 (1993). The juvenile court has broad discretion as to the disposition of those who fall within its jurisdiction. In re Interest of R.A. and V.A., supra. Juvenile courts have broad discretion to accomplish the purpose of serving the best interests of the children involved. Id. Juvenile courts have long recognized that psychiatric testing or psychological evaluations of a parent may be required to determine the best interests of children when issues of custody and visitation are presented. Id.
In the instant case, S.Q. and A.Q. still seek a relationship with T.T. even though T.T. is working toward independent living. S.Q. and A.Q. participate in family therapy with T.T. And, in the dispositional order, the juvenile court ordered that S.Q. and A.Q. shall have "therapeutic/supervised" visitation and reasonable telephone contact with T.T., as recommended by his therapist.
T.T.'s therapist, a licensed mental health professional, testified that one of the treatment goals in this case is communication between S.Q., A.Q., and T.T. The therapist testified that having S.Q. and A.Q. do a pretreatment assessment would "be advisable" and would help with the therapeutic treatment of this family because it "opens avenues for more proactivity" and would "make things better potentially." The therapist also stated that given the situation (i.e., use of the Safe Haven law), it would be appropriate for the parents to do a pretreatment assessment to see what issues are involved with the family. The therapist testified that it would be in T.T.'s, and the family's, best interests for S.Q. and A.Q. to do a pretreatment assessment and that such would be helpful even though the permanency goal for T.T. is independent living.
The parents' participation in a pretreatment assessment does "tend to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained." See In re Interest of J.S., A.C., and C.S., 227 Neb. 251, 268, 417 *623 N.W.2d 147, 158 (1987). The adjudication was based on T.T.'s being "in a situation dangerous to [his life] or injurious to [his] health or morals," see § 43-247(3)(a), in that his parents effectively removed him from his home by leaving him at a hospital under the then-effective Safe Haven law. A pretreatment assessment is reasonably related to the rehabilitative plan, even though the permanency goal is independent living, because S.Q., A.Q., and T.T. want a continued relationship and T.T. is still a minor. Working toward an improved relationship was clearly included in the juvenile court's order of February 3, 2009, because it ordered "therapeutic/supervised" visitation and telephone contact. The therapist testified that the parents' participation in a pretreatment assessment would help with the family's therapeutic treatment and would be in T.T.'s, and the family's, best interests. Giving the juvenile code a liberal construction, as we must, see In re Interest of R.A. and V.A., 225 Neb. 157, 403 N.W.2d 357 (1987), overruled on other grounds, State v. Jacob, 242 Neb. 176, 494 N.W.2d 109 (1993), we find that the juvenile court's rehabilitative plan requiring the parents to participate in a pretreatment assessment was reasonable in this case. We affirm such order.

CONCLUSION
For the reasons stated above, we find that S.Q. and A.Q.'s appeal regarding the order restricting parental disclosure of information about T.T. was timely. We find that the State did not introduce evidence of imminent harm to T.T. of sufficient magnitude to overcome the heavy presumption of the unconstitutionality of the gag order. Therefore, we reverse, and vacate that portion of the juvenile court's dispositional order of February 3, 2009.
We further find that the juvenile court's order requiring the parents to participate in a pretreatment assessment was timely appealed, but that the order was reasonable, appropriate, and supported by the evidence. Thus, we affirm such order.
AFFIRMED IN PART, AND IN PART REVERSED AND VACATED.
MOORE, Judge, participating on briefs.