FILED
04/27/2017
Clerk of the
Appellate Courts



# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 23, 2017 Session

## SINAN GIDER v. LYDIA HUBBELL

**Appeal from the Juvenile Court for Davidson County**
**No. AC1999585, 2008-5426       Sheila Calloway, Judge**

_____

## No. M2016-00838-COA-R3-JV

_____

On the petition of a father, a juvenile court held the mother of father's child in civil contempt. The court found 19 separate instances of mother violating three orders enjoining her from making certain derogatory comments, both in person and on social media. Our review of the record leads us to conclude that the mother violated only two of the orders cited by the father. We also conclude that the court erred in holding the mother in contempt for two of the counts alleged by the father. Even so, the juvenile court properly found the mother in contempt for 17 violations of court orders, and we find the sanctions imposed by the court to be appropriate. Therefore, we affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Lydia Ann Hubbell, Antioch, Tennessee, pro se appellant.

Sarah L. Reist, Nashville, Tennessee, for the appellee, Sinan Gider.

## OPINION

### I.

This is the second appeal arising from the relationship of Lydia Hubbell ("Mother") and Sinan Gider ("Father") and the parenting of their child, Dilara.[1]  Shortly

---

[1]*See Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 WL 1178260 (Tenn. Ct. App. Mar. 29, 2017).

after Dilara's birth, in October 2008, the parties entered into a parenting agreement in which Mother was designated as primary residential parent and Father had parenting time 180 days out of the year. However, the parents did not follow the parenting plan and, instead, operated under an informal arrangement whereby each spent substantially equal time with the child.

### A. PETITIONS TO MODIFY THE CUSTODY ARRANGEMENT

On May 20, 2014, in the Juvenile Court for Davidson County, Tennessee, Father filed a pleading entitled, "Petition to Establish Parenting Plan and Deny Mother's Request to Homeschool the Child." In his petition, Father alleged that there had been a material change in circumstances due to Mother's unstable mental health, problems with her physical health, and the condition of Mother's home. He also alleged that homeschooling, as proposed by Mother, was not in the child's best interest. Father requested that he be named primary residential parent with Mother having parenting time two days a week or every other weekend. The same day, Father also filed a motion to enjoin Mother from homeschooling Dilara. Mother filed an answer/counter-petition on June 6, 2014, in which she sought sole decision-making authority for the child.

On July 15, 2014, a magistrate judge entered an order enjoining Mother from homeschooling the child based on concerns over Mother's lack of organizational skills and health. The order granted Father permission to apply to private school for the child, and if the parties could not agree upon where to send Dilara to school, they were to return to court for a hearing on the matter. After conducting a hearing, the magistrate entered an order on July 21, 2014, providing that Dilara would attend the public elementary school for which Mother was zoned. The magistrate judge also ordered both parties to refrain from making negative remarks about the child's schooling situation or the court's order in front of the child.

Subsequently, Father filed a notice of nonsuit. The magistrate dismissed Father's petition without prejudice but kept its orders enjoining the Mother from homeschooling and ordering the child to attend public school in place. For her part, Mother filed a motion requesting to proceed as plaintiff on her request for sole decision-making authority and to homeschool the child, which was granted.

On January 5, 2015, the magistrate judge entered an order ruling upon Mother's counter-petition. The magistrate kept the previous order enjoining Mother from homeschooling in place and ordered parents to continue with joint decision-making. The parents were also ordered to attend a co-parenting class. The magistrate judge further ordered the parents to refrain from discussing the custody case "in *any* form or fashion" in front of the child and specifically ordered Mother not to "post anything on social media sites relating to the Child's behavior or her negative thoughts about the Father, nor

2

shall she make negative statements about the Father to any joint friends of the parties." Thereafter, Mother filed a motion for rehearing with the juvenile court judge.

On February 24, 2015, Father filed a new petition to modify and/or establish a permanent parenting plan. Father again proposed that he be named primary residential parent, but this time, he proposed that Mother exercise parenting time from Saturday at 3:00 p.m. until Sunday at 3:00 p.m. and on Wednesdays after school from 3:00-6:00 p.m. This proposal represented a significant change from their prior informal parenting arrangement. Father also requested that he be granted sole educational decision-making authority for the child.

Mother's request to rehear and Father's petition to modify and/or establish a permanent parenting plan were combined and set for trial before a juvenile court judge. Pending trial, the court ordered that Father would exercise parenting time during the week and Mother would exercise parenting time every weekend from after school on Friday to 6:00 p.m. Sunday.

The court held a trial on Mother's request to rehear and Father's petition to modify and/or establish a permanent parenting plan over five days in April, May, and August of 2015. On October 15, 2015, the court entered an order in which it determined Father should be designated primary residential parent and have sole decision-making authority. The juvenile court also ordered several restrictions on Mother's visitation and enjoined Mother from "referencing Father at all on social media." The court stated, "This includes, but is not limited to, references to 'Dilara's Father' or 'my Turkish enemy' as well as any remarks which would lead a reasonable person to assume refer to Father." Mother was further enjoined from discussing the custody proceedings and other "adult-only issues," with the child.

### B. FATHER'S CONTEMPT PETITIONS

On January 5, 2015, Father filed a Petition for Civil Contempt, alleging Mother had willfully violated orders issued by the juvenile court through her social media posts. On December 18, 2015, Father sought permission to amend his petition to allege additional violations, which the court granted. After Father struck several of the counts from his petition, 19 alleged instances of civil contempt against Mother remained.

Ordinarily, we might quote the alleged instances of contempt, which included the language Mother used in her social media posts. In this instance, we see little benefit to repeating verbatim some of Mother's comments. Suffice it to say Mother, among other things, falsely accused Father of being a rapist and implied that Father may have abused their daughter. Consequently, we only detail Mother's posts to the extent necessary to explain our decision.

3

Following a hearing, the juvenile court found that Mother had violated three court orders: (1) the magistrate judge's July 2014 order enjoining the parents from making negative remarks about the child's schooling situation or the court's order in front of the child; (2) the magistrate's January 2015 order enjoining Mother from posting on social media sites relating to the child's behavior or her negative thoughts about Father; and (3) the juvenile court's October 2015 order enjoining Mother from referencing Father at all on social media.

Mother admitted at the hearing that she intentionally violated the orders because she felt that they were unjust. The court found that Mother's violations were willful. But the court determined that jail time for Mother would not be in the best interest of the child and would not change Mother's behavior. Instead, the court ordered Mother to remove all negative posts and set a review hearing to confirm Mother's compliance.

At the review hearing, the court found Mother had removed all but one negative post but that her failure to do so was inadvertent. Accordingly, the court ordered Mother to remove the last negative post and declared that she had purged herself of her contempt. The court then granted Father's request for an award of attorney's fees associated with his contempt petition. In light of Mother's financial means, the court awarded Father only a portion of his requested fees. Mother was ordered to pay $500 at the rate of $25 per month.

## II.

Mother, acting pro se,[2] filed a timely appeal. As she did before the juvenile court, Mother admits to violating the subject court orders; however, she argues that the orders are unlawful because they violate her free speech rights. She contends, therefore, that the orders that she admittedly violated cannot form the basis for a contempt finding. Mother also requests this Court to find Father in contempt and to sanction Father's attorney for pursuing contempt proceedings against her.

### A. CIVIL CONTEMPT

Under Tennessee Code Annotated § 29-9-102(3) (2012), courts have the power to "issue attachments, and inflict punishments for contempts of court" for "[t]he willful disobedience or resistance of any officer of such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts." Contempt may be either civil or criminal in nature. *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 473 (Tenn. 2003). Civil contempt, which is at issue here, is intended to benefit a private party who has suffered a violation of rights, and "the quantum of proof necessary to convict is a preponderance of the evidence." *Id.* at 473-74.

---

[2] Mother also represented herself throughout the majority of the proceedings below.

4

Defiance of a court order may constitute contempt if four elements are present. *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 354 (Tenn. 2008).

> First, the order alleged to have been violated must be "lawful." Second, the order alleged to have been violated must be clear, specific, and unambiguous. Third, the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order. Fourth, the person's violation of the order must be "willful."

*Id.* at 354-55 (footnotes omitted). The first two elements, whether the order is lawful and sufficiently clear and specific, are questions of law, which we review de novo on appeal. *Id.* at 355-56; Tenn. R. App. P. 13(d). The last two elements, whether the person charged with contempt actually violated the order and acted willfully in doing so, are questions of fact. *Konvalinka*, 249 S.W.3d at 356-57. We review the trial court's findings of fact de novo on the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).

Ultimately, however, whether to hold "a person [that] has willfully violated a lawful and sufficiently clear and precise order" lies within the court's sound discretion. *Konvalinka*, 249 S.W.3d at 358. "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted).

Our review of discretionary decisions is limited. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009). We do not "second-guess the court below" or "substitute [our] discretion for the lower court's." *Lee Med., Inc.*, 312 S.W.3d at 524. In reviewing discretionary decisions, we consider "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Id.*

Here, the juvenile court found 19 separate instances of Mother violating court orders. Mother does not dispute that she actually and willfully violated the orders, nor does she argue that the orders were ambiguous. Rather, Mother argues that the three orders, which she was found to have violated, were unlawful because each constituted an impermissible prior restraint on speech. Our focus, therefore, is on the first element of a civil contempt claim based upon an alleged disobedience of a court order: lawfulness.

At the outset, we note that the record before us reveals that the orders were "lawful" in that the juvenile court had jurisdiction over both the subject matter of the case and the parties. *See Konvalinka*, 249 S.W.3d at 355 ("A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties. An order is not rendered void or unlawful simply because it is erroneous or subject to reversal on appeal.") (citations omitted); *Jefferson Cty. v. Smith*, No. E2009-02674-COA-R3-CV, 2011 WL 3062010, at *18 (Tenn. Ct. App. July 26, 2011).

Father contends that Mother has, in effect, waived her constitutional argument regarding the injunctions because her argument was not timely made. Father points out that, rather than properly raising the issue in an appeal of the orders themselves, Mother has chosen to violate the lower court's orders and to challenge their appropriateness only after being charged with civil contempt. Even so, as discussed below, Mother did raise the constitutionality of the juvenile court's October 2015 order in her first appeal. *Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 WL 1178260, at *10 (Tenn. Ct. App. Mar. 29, 2017) [hereinafter *Gider I*]. In addition, Mother sought de novo review of the magistrate judge's orders. Thus, a review of the constitutional soundness of the injunctions is appropriate. *See Tenn. Dep't of Health v. Boyle*, No. M2001-01738-COA-R3-CV, 2002 WL 31840685, at *8 (Tenn. Ct. App. Dec. 19, 2002) ("'[C]ivil contempt falls with the order if it turns out to have been erroneously or wrongfully issued.'") (quoting *Cliett v. Hammonds*, 305 F.2d 565, 570 (5th Cir. 1962)); *E. Associated Coal Corp. v. Doe*, 220 S.E.2d 672, 679-80 (W. Va. 1975) ("The rule that unconstitutional court orders must nevertheless be obeyed until set aside presupposes that: the court issuing the order enjoys personal jurisdiction and colorable subject matter jurisdiction over the controversy; adequate and effective remedies are available for orderly and prompt review of the challenged rulings; and, the court order and subsequent conduct does not require an irretrievable surrender of constitutional guarantees.") (citing *United States v. Dickinson*, 465 F.2d 496, 509 (5th Cir. 1972)).

In *Gider I*, we addressed and rejected Mother's prior restraint arguments related to restrictions on making defamatory remarks about Father and discussing the case and other specified topics with Dilara. We explained as follows:

> Under these facts, it is entirely proper for the juvenile court to restrict Mother from making disparaging and clearly defamatory remarks about Father online or to the child or in the presence of the child. *See In re T.R.*, 556 N.E.2d 439, 454 (Ohio 1990) ("[A] juvenile court, which is not presumptively open, has the power to control extrajudicial comments by the litigants, provided the restrictions are consistent with [constitutional standards]."); *In re Conservatorship of Turner*, [No. M2013-01665-COA-R3-CV,] 2014 WL 1901115, at *20 [(Tenn. Ct. App. May 9, 2014)] (holding that defamatory speech may be enjoined if narrowly tailored to limit the prohibited speech to that which has been determined to be false).

6

Such remarks are "not worthy of constitutional protection." *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). And we conclude that the restrictions placed on Mother in this regard do not unduly burden constitutionally protected speech. *See In re Brianna B.*, 785 A.2d 1189, 1195 (Conn. App. Ct. 2001) (concluding a confidentiality order did not violate adoptive mother's right to free speech where the trial court "did not absolutely bar any discussion of the proceedings, permitting the petitioner to discuss the proceedings with a child advocate or her legislative representative."). In light of their adverse effect on Dilara, the record also supports restricting Mother's communication to the child about the court proceedings and other topics specifically identified in the order. The demonstrated harm outweighs Mother's free speech rights.

*Gider I*, 2017 WL 1178260, at *12. Nevertheless, we concluded that certain restrictions contained in the October 2015 order were overbroad or vague. As a result, we modified the October 2015 order "to remove the prohibitions against 1) any reference by Mother to 'Father at all on social media' or 2) discussions of 'adult-only issues' beyond those topics specifically referenced in the injunction." *Id.*

The July 2014 and the January 2015 injunctions, like the injunction contained in the October 2015 order, are clearly prior restraints on Mother's speech. Again, as we explained in *Gider I*:

Though we have uncovered no Tennessee cases directly on point, we are guided by the decisions of our sister states. In cases such as this one, the danger of physical or emotional harm to the child must be balanced against the parent's First Amendment rights. *Baskin v. Hale*, 787 S.E.2d 785, 791 (Ga. Ct. App. 2016), *cert. denied*, (Jan. 17, 2017); *see also In re T.T.*, 779 N.W.2d 602, 620 (Neb. Ct. App. 2009). In doing so, courts must consider whether the activity restrained poses a "clear and present danger or a serious and imminent threat to a protected competing interest." *In re R.J.M.B.*, 133 So. 3d 335, 343 (Miss. 2013) (quoting *United States v. Brown*, 218 F.3d 415, 425 (5th Cir. 2000)) (internal quotations omitted).

*Id.* at *11. Employing the same reasoning we used in the prior case, we now address the constitutional soundness of the remaining two injunctions.

The July 2014 injunction prevents both parents from making negative remarks about the child's schooling situation or the court's order in front of the child. We have already held that, in light of their adverse effect on the child, the court was justified in restricting communication to the child about the court proceedings. Yet, we do note that nothing in this record indicates that Mother actually violated the July 2014 order. In his initial petition, Father alleged several counts of civil contempt concerning incidents

where Mother purportedly expressed her negative views about Dilara's school to the child in violation of the court's order. However, prior to trial, Father filed a motion to strike these counts from his petition. The 19 remaining counts exclusively condemn Mother's social media posts, not her communications with her daughter. The facts, therefore, preponderate against the juvenile court's finding that Mother violated the July 2014 injunction.

Next, we turn to the January 2015 injunction, in which the parents were again enjoined from discussing the custody proceedings with the child. And, particularly relevant to this appeal, Mother was further ordered not to "post anything on social media sites relating to the Child's behavior or her negative thoughts about the Father, nor shall she make negative statements about the Father to any joint friends of the parties." As we concluded in *Gider I*, certain restrictions contained in this particular injunction, while appropriate, are overbroad. The prohibition against posting "anything on social media sites relating to the Child's behavior" presumably prohibits any reference at all to the child on social media, even benign posts that would pose no risk of harm to the child. Therefore, because the portion of the January 2015 injunction preventing Mother from posting anything related to the child's behavior is unconstitutionally overbroad, violation of that portion of the order cannot form the basis for civil contempt.

Even considering the October 2015 order as modified and our conclusion regarding the January 2015 order, Mother's social media posts clearly justify the court's finding of civil contempt. As noted above, Mother admitted as much, both before the trial court and in her brief on appeal. Each of the 19 posts cited by the juvenile court contains disparaging remarks about Father, with the exception of two: Count 4 and Count 11.

Mother's December 14, 2014 post mentioned in Count 4 only discusses the child and the child's schooling. Mother stated, "I was surprised that they finally assessed [Dilara] at school last week and they found her to be at 'end of first grade' level 'J'. Either she is regressing or they don't challenge her far enough." However, the July 2014 order enjoined Mother from making negative remarks to the child about the child's schooling. The order did not prevent Mother from making such remarks on social media. And, as explained above, we have concluded that the portion of the January 2015 order preventing Mother from posting "anything on social media sites relating to the Child's behavior" could not properly form the basis for a finding of contempt. Therefore, the juvenile court erred in holding Mother in contempt based on Count 4.

Next, Count 11 implicates Mother's social media post from November 3, 2015, which states as follows:

> If I go to jail, I have people who are going to step in and continue to tell my story anonymously[.] The addresses, phone numbers, names of all those

involved are not secret. I have given copies of paperwork, affidavits, recordings, etc. to several different people . . . . Not only is [the Guardian Ad Litem] ignorant of the law, she is a control freak . . . .

While Mother's language in this post involves the court proceedings, the injunctions imposed on her forbade her from discussing the court proceedings in her daughter's presence, not on social media. The post also does not reference Father. Therefore, the evidence preponderates against the finding that Mother violated an existing court order by her November 3 post on social media.

Even so, after finding multiple instances of contempt, the only sanction imposed by the juvenile court was for Mother to pay a portion of Father's attorney's fees incurred in seeking enforcement of the court's orders. In light of the 17 instances of contempt supported by the record, we conclude there was no abuse of discretion in the sanction imposed.

## B. REMAINING ISSUES

In her brief on appeal, Mother requests that we "discourage further abuse of process" by finding Father in contempt of court. Mother also requests, as she did in *Gider I*, that Father's attorney be sanctioned "to serve as a deterrent to the kind of abusive misuse of the legal system that led to this appeal." In light of this decision, we decline to do so.

## III.

For the foregoing reasons, we reverse the juvenile court's finding that Mother violated the injunction contained in the July 2014 order. We also reverse the court's finding on two of the 19 counts of civil contempt asserted by Father. We affirm the decision of the juvenile court in all other respects.

_____
W. NEAL MCBRAYER, JUDGE

9