**[J-29-2020] [MO: Baer, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| S.B. | : | No. 39 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Superior Court entered December |
| | : | 24, 2018 at No. 753 WDA 2018, |
| | : | affirming the Order of the Court of |
| S.S. | : | Common Pleas of Allegheny County |
| | : | entered April 27, 2018 at No. FD-15- |
| | : | 008183-10. |
| APPEAL OF: S.S., RICHARD DUCOTE, | : | |
| ESQUIRE, AND VICTORIA MCINTYRE, | : | ARGUED:  May 27, 2020 |
| ESQUIRE | : | |

## DISSENTING OPINION

**JUSTICE WECHT**                                      **DECIDED:  DECEMBER 22, 2020**

The Majority discerns no constitutional infirmity in a gag order that bars a parent and her attorneys in a contentious and ongoing custody case from "speak[ing] publicly or communicat[ing] about" that case.[1]  The order that today's Majority blesses does not stop there; it even purports to prohibit the parent and her lawyers from "direct[ing] or encourag[ing] third parties to speak" about the case.[2]  The gag order allows only two limited exceptions: (1) testifying before either the Pennsylvania General Assembly or the United States Congress; and (2) "expressing an opinion about the [trial] Judge."[3]  Even in those two circumscribed contexts, while the parent ("Mother") and her counsel may

---

[1]      Findings of Fact and Order of Court ("T.C.O."), 4/27/2018, at 4; R.R. at 323(a).

[2]      *Id.*

[3]      *Id.* at 5.

speak, they may not identify Mother by name, nor disclose any information that would "tend to identify" Mother's child.[4] The gag order is without any time limit whatsoever; it applies in perpetuity. No doubt, there are countries in our world where overbroad prior restraints on speech of this sort pass muster. But not here. Or so I thought, until today.

Let's be honest. Mother is no Girl Scout. There are appealing reasons why a judge might seek to limit Mother's speech and that of her attorneys. These reasons arise from the extraordinary and potentially psychologically injurious pattern of public conduct in which Mother and her attorneys ("Counsel") have engaged. But if one thing ought to be clear from American legal history, it is that we should not allow hard cases to make bad law. Certainly, most of our constitutional protections have been forged in unseemly crucibles.[5] In bestowing its constitutional imprimatur on a gag order so broad, the Majority risks erosion of core First Amendment protections.

I do not dispute the trial court's factual findings. Nor do I doubt the sincerity and good intentions that underlie the efforts by the lower courts and by today's Majority which aim to protect the child ("Child") from harmful consequences that could ensue from the Mother's speech and that of her Counsel. This is an unusual case. The testimony of a child in a custody dispute is rarely the subject of a press conference. Far more frequently, a child is harmed when a parent criticizes the other parent to the child or shares details of a divorce with a confidant in the child's presence. But regardless of the source of the

---

[4]     *Id.*

[5]     Messrs. Miranda, Escobedo, and Gideon, for example, were hardly model citizens. *See Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that statements will be inadmissible as a violation of the Fifth Amendment when obtained in a police interrogation without the suspect receiving warning of his or her rights); *Escobedo v. State of Ill.*, 378 U.S. 478 (1964) (holding that when a suspect is interrogated with the goal of eliciting incriminating statements and the suspect has not been warned about his or her right to remain silent, the denial of the opportunity to consult with the suspect's attorney is a violation of the Sixth Amendment); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (holding that an indigent defendant in a state criminal prosecution has a right to court-appointed counsel).

harmful speech, and good intentions notwithstanding, American courts may not enter unconstitutionally overbroad, content-based gag orders at will.

The order that we examine today reads as follows:

> [Father's] Motion for Other Relief is **GRANTED** in part. It is hereby **ORDERED** that [Mother]; Richard Ducote, Esquire; and Victoria McIntyre, Esquire shall NOT speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications. The following is also **ORDERED**.
>
> 1. [Mother]; Richard Ducote, Esquire; and Victoria McIntyre shall NOT direct or encourage third parties to speak publicly or communicate about this case including, but not limited to, print and broadcast media, on-line or web-based communications, or inviting the public to view existing on-line or web-based publications.
> 2. [Mother]; Richard Ducote, Esquire, and Victoria McIntyre may provide public testimony in the State House and/or Senate in the United States Congress and Senate about parental alienation, sexual abuse of children in general or as it relates to this case. However, in providing such testimony, they shall NOT disclose any information that would identify or tend to identify the Child. [Mother] shall NOT publically state her name, the name of the Child, or [Father's] name. Attorney Ducote and Attorney McIntyre shall NOT publically refer to [Mother], the Child, or [Father] by name or in any manner that would tend to identify the aforementioned parties.
> 3. [Mother] and Counsel shall remove information about this case, which has been publically posted by [Mother] or Counsel, including but not limited to, the press release, the press conference on the YouTube site, the Drop Box and its contents, and other online information accessible to the public, **within twenty-four (24) hours.** [Mother] and Counsel shall download or place the aforementioned information onto a thumb drive, which shall be filed with this court.
>
> The Oral Motion to Stay This Order of Court, made on behalf of [MOTHER] is **DENIED**[.]
>
> This Order does not prohibit any party or counsel from publicly speaking or expressing an opinion about the Judge, including disclosing the entry of this Order of Court, *after* the information has been removed as set forth, above. However, such expression shall NOT contain the name of the Child or other information, which would tend to identify the Child.

T.C.O. at 4-5 (emphasis in the original).

The Majority maintains that this gag order "in no way silences [Mother or Counsel] from expressing all of their views on important issues relating to the custody proceeding."[6] The Majority further claims that, "when read in context, the order affords Appellants ample opportunity to disseminate all of their thoughts into the marketplace of ideas without restriction on the content of their message."[7]

I disagree. The order expressly prohibits Mother and Counsel from speaking publicly or communicating about the case. The order even provides some examples of the prohibited communication methods, and then proceeds to stress that the prohibition is not limited to those methods. The order prohibits Mother and Counsel from using a third party to communicate about the case, and requires Mother and Counsel affirmatively to remove information posted about the case. As noted, the order provides two limited exceptions to its sweeping prohibitions. Provided that Child is not identified and Mother is not named, Mother and Counsel may testify before a legislative body and may express an opinion about "the Judge." Far from affording Mother and Counsel "ample opportunity to disseminate all their thoughts into the marketplace of ideas without restriction on the content of their message,"[8] this gag order in fact closes that marketplace, barricades all but two narrow avenues of expression, and imposes substantial roadblocks even upon those outlets.

The question before us is not whether Mother's and Counsel's speech was wise or appropriate. It was neither. Holding a press conference that highlights sensitive information about Child certainly casts into doubt any claim that Mother acted in Child's

---

[6]     Maj. Op. at 22.

[7]     *Id.* at 23.

[8]     *Id.*

best interests. Mother's conduct no doubt was a legitimate consideration as the trial court weighed the parents' claims regarding custody of Child. But the Majority fails to understand that the question before us — whether Mother's speech rights were infringed — is a separate issue. At this late date, it should no longer need to be said that First Amendment cases rarely involve speech that is pleasant, agreeable, or temperate.[9]

In the absence of relevant precedent from this Court, we might seek wisdom from other jurisdictions that have confronted similar issues. In the context of a juvenile court case, the Nebraska Court of Appeals examined a gag order that precluded the parents from discussing publicly the child's name or medical information, including treatment and diagnoses.[10] The court determined that the gag order was a prior restraint on the parents' speech and was directed at the content of that speech.[11] As such, the order was subject to "exacting scrutiny."[12] The court agreed with the juvenile court that disclosure of the child's medical information was not in the child's best interests. But "the fundamental difficulty is that the child's best interests are not the standard, nor does the juvenile court's rationale for the entry of the gag order comport with the established law allowing the lawful

---

[9] *See, e.g.*, *Cohen v. California*, 403 U.S. 15 (1971) (reviewing Cohen's conviction for disorderly conduct for wearing a jacket with "Fuck the Draft" written on the back into a courthouse); *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (reviewing the conviction of a Ku Klux Klan member who, at a rally, suggested that action against the government may be required); *Whitney v. California*, 274 U.S. 357 (1927) (reviewing Whitney's criminal conviction for assisting in the organization of the California branch of the Communist Party and reading a resolution calling for a workers' revolution); *Commonwealth v. Knox*, 190 A.3d 1146 (Pa. 2018) (determining whether a rap video containing threatening lyrics was protected speech).

[10] *In re T.T.*, 779 N.W.2d 602 (Neb. Ct. App. 2009).

[11] *Id.* at 612, 614.

[12] *Id.*

entry of a judicial order imposing a prior restraint on speech."[13]  Having found no imminent harm to the child sufficient to justify a prior restraint, the court vacated the gag order.[14]

*In re R.J.M.B.*, 133 So. 3d 335 (Miss. 2013), involved a mother who was misunderstood by an interpreter at the hospital when she gave birth to the child.  As a result of the linguistic misunderstanding, the child was removed from the mother's custody for a year.  When the mother and the child were reunited, the trial court entered a gag order that did not permit any of the parties to speak to the press about the case.  On appeal, the Mississippi Supreme Court first noted that gag orders which restrict parties or others from publicly discussing a case "resemble prior restraints" that "suppress[] speech based on its content before the speech is uttered."[15]

The Mississippi Supreme Court recognized a split in the standard used by courts to measure the government's burden in supporting a gag order directed at attorneys or litigants.  While strict scrutiny has applied to restraints against the press, some courts have applied a different test when the restraint is against attorneys or parties.  For example, the United States Courts of Appeals for the Sixth, Seventh, and Ninth Circuits have applied strict scrutiny, requiring that the gagged speech "poses either a clear and present danger or a serious and imminent threat to a protected competing interest."[16] The Fourth, Fifth, and Tenth Circuits have applied a less exacting standard, such that

---

[13]     *Id.* at 620.

[14]     *Id.* at 621.

[15]     *Id.* at 343.

[16]     *Id.* at 344.

participants may be restrained from speaking "if the comments present a 'reasonable' or 'substantial' likelihood of prejudicing a fair trial."[17]

The Mississippi Supreme Court concluded that applying the less stringent standard would impermissibly burden the mother's speech rights, and that the stricter "clear-and-present-danger test" applied instead.[18] The court noted that several other state courts had applied the higher standard to gag orders in cases involving children.[19,20] The lower court had not applied any such balancing test, and the Mississippi Supreme Court concluded that there was no imminent danger to any compelling state interest sufficient to justify the gag order.[21]

In *Johanson v. Eighth Judicial District*,[22] the father had filed a motion to modify a child support order, which the lower court had granted. Shortly thereafter, the father filed

---

[17]    *Id.* The Mississippi Supreme Court reviewed *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), in which the Supreme Court of the United States held that a demonstration of "substantial likelihood of material prejudice" was required in order constitutionally to restrict an attorney's speech. *Gentile* involved an attorney who faced disciplinary charges after he spoke at a press conference about a criminal trial. The court noted that the Fifth Circuit had adopted this reasoning and test in allowing a gag order aimed at ensuring a fair trial. The Mississippi Supreme Court, however, rejected the application of the lesser "substantial likelihood" test because, unlike in *Gentile*, the governmental interest in ensuring a fair trial was not at stake in *In re R.J.M.B.*, which was not before a jury.

[18]    *Id.* at 345.

[19]    *Id.* (citing *In re T.T.*; *State ex rel L.M.*, 3 P.3d 1188, 1193-96 (Utah Ct. App. 2001); *In re J.S.*, 640 N.E.2d 1379, 1382 (Ill. Ct. App. 1994)).

[20]    *See also Baskin v. Hale*, 787 S.E.2d 785, 792 (Ga. Ct. App. 2016) (applying an "imminent danger" standard and vacating an injunction that prevented the parents and their attorneys from putting information about a custody case on any social media, website, or public medium).

[21]    *Id.* at 346.

[22]    182 P.3d 94 (Nev. 2008).

a motion to correct some clerical errors in the order because the father was concerned that the order could be used against him in his campaign for a judgeship. S*ua sponte*, the lower court entered a gag order that precluded the parties and their attorneys from disclosing any document or discussing the case with any other party or individual.[23] The mother challenged the order. The Nevada Supreme Court recognized that gag orders "preventing participants from making extrajudicial statements about their own case amount[] to a prior restraint on speech and undermine[] First Amendment rights."[24] The court adopted the Ninth Circuit's standard, which requires a clear and present danger or serious and imminent threat to a protected interest, a narrowly drawn order, and the lack of available less restrictive alternatives. The court concluded that the lower court had failed to consider whether there was any clear and present danger to a protected interest and had made no findings related to the least restrictive alternative. The court also held that the order was overbroad and was not narrowly tailored.[25] The court also noted that the gag order did not have an expiration date. Because the constitutional standard had not been met, the court concluded that the gag order violated the mother's rights.[26]

Like the courts of our sister states, Pennsylvania courts generally have applied stringent scrutiny in reviewing the lawfulness of prior restraints on speech. Because of the presumption that prior restraints are unconstitutional, the reviewing court must

---

[23] *Id.* at 96.

[24] *Id.* at 98.

[25] *See id.* at 99 (concluding that "[t]he limits of th[e] order are endless.").

[26] The constitutionality of restraining parental speech in custody cases continues to be litigated around the country. *See, e.g., Delgado v. Miller*, __ So.3d ____, 2020 WL 7050217 (Fla. Dist. Ct. App. Dec. 2, 2020) (holding that a provision of a custody order that precluded the parents from commenting about the other party's emotional or mental health or personal behavior on social media was a prior restraint that had not been found to be necessary, was not narrowly tailored, and was overbroad).

evaluate the following in determining whether such restraints are permissible: "(a) the nature and extent of the evil to be avoided, (b) whether other measures [are] likely to mitigate the effects of unrestrained publicity, and (c) how effective a restraining order [is] to prevent the threatened danger."[27]  Because it perceives the order in question here to be a content-neutral restriction — a conclusion with which I disagree — today's Majority avoids this issue entirely.

The United States Court of Appeals for the Fourth Circuit has provided an instructive discussion of gag orders:

> Even among First Amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions. Like all "court orders that actually forbid speech activities," *Alexander v. United States*, 509 U.S. 544, 550 (1993), gag orders are prior restraints. Prior restraints bear "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  Prior restraints upend core First Amendment principles because "a free society prefers to punish the few who abuse rights of speech after they break the law [rather] than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).
>
> Similarly, gag orders are presumptively unconstitutional because they are content based. *Nat'l Inst. of Family and Life Advocates v. Becerra*, ___ U.S. ____, 138 S.Ct. 2361, 2371 (2018) (presumption against content-based restraints).  Content-based restrictions target "particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  Gag orders inherently target speech relating to pending litigation, a topic right at the core of public and community life.  But the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573, (2002) (internal quotation marks omitted).
>
> In light of these twin presumptions, gag orders must survive strict scrutiny. *Reed*, 576 U.S. at 163 (strict scrutiny for content-based restrictions).

---

[27]  *Commonwealth v. Genovese*, 487 A.2d 364, 367 (Pa. Super. 1985) (citing *Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976)).

*In re Murphy-Brown, LLC*, 907 F.3d 788, 796-97 (4th Cir. 2018) (citations modified). The perpetual gag order at issue in this case is a content-based prior restraint. As such, it must be measured by strict scrutiny. So measured, it cannot survive.

The United States Supreme Court has defined content-neutral restrictions "as those that 'are *justified* without reference to the content of the regulated speech.'"[28] Thus, they must be evaluated differently from content-based restrictions, as the latter implicate the important principle "that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'"[29]

The High Court recently has explained:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.
>
> Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys. Those laws, like those that are content based on their face, must also satisfy strict scrutiny.

*Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (cleaned up).

---

[28]   *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48-49 (1986) *(quoting Va. Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976)) (emphasis in original).

[29]   *Id.* at 48-49 (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95-96 (1972)).

We have urged a common-sense approach to determining whether a regulation is content-based or content-neutral, suggesting that it is "relevant that an obvious purpose of the ordinance was to directly burden freedom of expression itself."[30]  Similarly, we have noted that, "[a]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'  With respect to noncommercial speech, this Court has sustained content-based restrictions only in the most extraordinary circumstances."[31]  In differentiating between content-based and content-neutral restrictions, this Court has held:

> If the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the "less stringent" four-part standard from *O'Brien*.[32]  But, if the governmental interest is related to the suppression of expression, then the regulation falls outside the scope of the *O'Brien* test and must be justified under a more demanding standard.

*Purple Orchid, Inc. v. Pennsylvania State Police*, 813 A.2d 801, 806 (Pa. 2002) (citations omitted).

Our Superior Court has found an injunction to be content-neutral where it did "not seek to ban any subject matter from being protested" but instead sought to restrict "the excessive tactics used by the protesters, not to stifle the message itself."[33]  By contrast, the Superior Court found an injunction to be content-based and unconstitutional where it prevented speech only critical of the plaintiff and was "directed against the ideas

---

[30]     *Pap's A.M. v. City of Erie*, 812 A.2d 591, 611-12 (Pa. 2002).

[31]     *Ins. Adjustment Bureau v. Ins. Com'r for Com. of Pa*, 542 A.2d 1317, 1320 (Pa. 1988) (quoting *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 65 (1983)).

[32]     *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (outlining four factors to consider when determining the constitutionality of a content-neutral speech regulation).

[33]     *SmithKline Beecham Corp. v. Stop Huntingdon Animal Cruelty USA*, 959 A.2d 352, 357 (Pa. Super. 2008).

expressed because of the detrimental impact which the communication of those ideas has had upon [the plaintiff]."[34]

Some of the case law distinguishing content-based restrictions from content-neutral ones has focused upon the perceived hostility to the message.[35] Hence, today's Majority focuses upon whether the trial court's order reflected hostility toward Mother's speech.[36] But this does not cover the waterfront; there are also restrictions that are deemed content-based because any common-sense reading reveals that the restriction is "based on the message a speaker conveys," such as when the restriction "defin[es] regulated speech by particular subject matter."[37] Our Court has followed this common-sense approach in determining whether or not a restriction is content-neutral.[38]

The restriction in today's case was based upon the content of speech. It was based upon a particular subject matter. It was based upon the message.[39] It was directed at the ideas expressed.[40] The first sentence of the gag order categorically bans Mother and Counsel from speaking about the custody case; the preclusion extends only to that topic and that message. This is the very essence of a content-based restriction. To

---

[34] *Franklin Chalfont Assocs. v. Kalikow*, 573 A.2d 550, 557 (Pa. Super. 1990).

[35] *See Reed*, 576 U.S. at 164 (recognizing content-based restrictions as those "that were adopted by the government because of disagreement with the message").

[36] Maj. Op. at 21 ("[T]he 'princip[al] inquiry in determining content neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))).

[37] *Reed*, 576 U.S. at 163.

[38] *Pap's*, 912 A.2d at 611.

[39] *See SmithKline Beecham Corp.*, 959 A.2d at 357.

[40] *See Franklin Chalfont Assocs.*, 573 A.2d at 557.

survive, it must withstand strict scrutiny. The perceived laudability of the trial court's goal does not change the nature of this restriction.

In addition to the fact that the gag order in this case is a content-based restriction, it also is a prior restraint on speech. "The term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur."[41] Prior restraints are disfavored and are subject to heightened scrutiny. "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity. The Government thus carries a heavy burden of showing justification for the imposition of such a restraint."[42] In addition, the gag order before us in this case is similar to those examined in the courts of our sister states, which have characterized those orders as prior restraints or something akin to them.[43]

While prior restraints often are associated with restrictions upon the press, they arise in other situations, as well.[44] Indeed, we have distinguished prior restraints on speech from limits that may sometimes restrict press or public access to the courts when those limits are needed to protect constitutional interests such as the right to a fair trial.[45]

While no doubt a reaction to communications that Mother and Counsel have already made, the gag order before us precludes Mother and Counsel prospectively from

---

[41] *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original) (cleaned up).

[42] *New York Times Co. v. United States*, 403 U.S. 713, 714, (1971) (cleaned up).

[43] *See In re T.T.*, *In re R.J.M.B.*, *In re J.S.*, *Johanson*, *supra*.

[44] *See William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59, 64 (Pa. 1961) (holding that the Motion Picture Control Act was a prior restraint when the Board of Censors had to approve movies before screening).

[45] *See Philadelphia Newspapers, Inc. v. Jerome*, 387 A.2d 425, 433 (Pa. 1978).

speaking about the custody case in advance of any communication that either of them might wish to make. The gag order does not simply deny access to case proceedings, as in closing the courtroom or sealing the trial court record. As a prior restraint, the gag order is subject to a presumption of constitutional invalidity and a heightened standard of review.

We have held:

> When the government restricts expression due to the content of the message being conveyed, such restrictions are allowable only if they pass the strict scrutiny test. That test is an onerous one, and demands that the government show that the restrictions are "(1) narrowly tailored to serve (2) a compelling state interest." *Republican Party of Minnesota v. White,* 536 U.S. 765, 775 (2002).

*In re Condemnation by Urban Redevelopment Auth. of Pittsburgh*, 913 A.2d 178, 183-84 (Pa. 2006) (citation modified). Here, the gag order is both content-based and a prior restraint. Accordingly, the Majority errs in reviewing the order under the *O'Brien*[46] factors. Instead, strict scrutiny must apply. I turn to analyze the order at issue against that exacting standard.

This Court has recognized that the protection of the health and well-being of children is a compelling state interest.[47] I do not for a minute doubt the considerable harm that Child may face as a consequence of Counsel and Mother's public campaign. Consequently, I agree that there is a compelling state interest at issue here.

---

[46] *United States v. O'Brien*, 391 U.S. 367, 377 (1968) (outlining four factors to consider when determining the constitutionality of a content-neutral speech regulation).

[47] *See D.P. v. G.J.P.*, 146 A.3d 204, 211 (Pa. 2016) ("[T]he state, acting pursuant to its *parens patriae* power, has a compelling interest in safeguarding children from various kinds of physical and emotional harm and promoting their wellbeing"); *Hiller v. Fausey*, 904 A.2d 875, 886 (Pa. 2006) (finding protection of children to be a compelling state interest for the purpose of infringing upon a parent's fundamental right to raise one's children).

This does not end the inquiry. To survive strict scrutiny, the order also must be narrowly tailored. The Majority believes that this order provides ample opportunity for Mother and Counsel to express their views. I disagree. In its first sentence, the order categorically prevents Mother and Counsel from speaking or communicating about the case publicly. There are only two limited and very specific exceptions for Mother and Counsel to express their views, and Mother is precluded in all circumstances from doing so in her own name, ostensibly because this might tend to identify Child. This sweeping gag order all but precludes Mother from speaking about this case to anyone other than Counsel. Moreover, the order is not limited in time. As in *Johanson*, the restriction is essentially endless and it is anything but narrowly tailored.

That I find the order here to be impermissible is not to suggest that I consider trial courts powerless to attach consequences to speech of a potentially injurious nature. Our General Assembly has provided trial courts with a list of factors to consider in making custody decisions.[48] The trial court could have considered Mother's behavior and statements under several of those factors in determining what custody arrangement would serve Child's best interests.[49] Whether Mother's speech was in derogation of Child's best interests certainly is a legitimate consideration in determining custody, and may appropriately be invoked to limit Mother's custodial rights. But imposing tangible

---

[48] *See* 23 Pa.C.S. § 5328(a) (listing sixteen factors).

[49] For example, Mother's public comments would be relevant to factor 8 ("The attempts of a parent to turn the child against the other parent"), factor 9 ("Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs"), factor 10 ("Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child"), factor 13 ("The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another"), or factor 16 ("Any other relevant factor"). 23 Pa.C.S. § 5328 (a).

consequences upon the hours and circumstances of child custody is one thing; infringing

upon, and gagging, constitutional rights of speech by prior restraint is quite another.[50]

I disagree as well with the Majority's generous conclusion that the gag order before

us is not vague. The order here is both overbroad and vague. As they relate to

government edicts, the doctrines of overbreadth and vagueness are as applicable to the

type of order in this case as they are to statutes, regulations, or rules.

> Arising from the Fourteenth Amendment's Due Process Clause, the void-for-vagueness doctrine requires that a statute or rule under attack be sufficiently definite so that people of ordinary intelligence can understand what conduct is prohibited, and so as not to create or encourage arbitrary or discriminatory enforcement. *Hill v. Colorado,* 530 U.S. 703, 732 (2000). When a statute is purportedly vague and arguably involves constitutionally protected conduct, vagueness analysis will necessarily intertwine with overbreadth analysis. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 6 (1982).
>
> A form of First Amendment challenge, the overbreadth doctrine prohibits an enactment, even if clearly and precisely written, from including constitutionally protected conduct within its proscriptive reach. *Grayned v. City of Rockford,* 408 U.S. 104, 114 (1972). In order to prevail on an overbreadth challenge, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, (1973). *See also Commonwealth v. Davidson,* 860 A.2d 575, 583 (Pa. Super. 2004) ("When the overbreadth of the statute is substantial, judged in relation to its legitimate sweep, it may not be enforced against anyone until it is narrowed to reach only activity unprotected by the constitution.").

*Commonwealth v. Perreault*, 930 A.2d 553, 559 n.1 (Pa. Super. 2007) (citations

modified).

---

[50] As the Nebraska court noted in *T.T.*, the child's best interests are not the relevant standard for determining whether a gag order unconstitutionally restricts speech. *See In re T.T.*, 779 N.W.2d at 620.

Overbreadth manifests when a substantial amount of constitutionally protected activity is swept up along with prohibitions barring unprotected activity.[51] When the restriction seeks to preclude only speech and not conduct, careful attention must be paid to the scope of the restriction so that protected speech is not chilled.[52]

Without a doubt, Mother and Counsel engage in otherwise protected activity when they speak about this case pending in our courts. As they say, this is America. The trial court could only prohibit as much speech as necessary to protect a compelling state interest, and no more. Instead, the trial court entered a sweeping order that prohibited Mother and Counsel from speaking publicly about the case except in starkly limited form and in two narrow contexts. Even in those two contexts, Mother could not identify herself. That is, she could not speak her own name. That latter restriction is breathtaking. If that is not an overly broad restriction, nothing is.

Turning to vagueness, the Majority brushes this argument aside, sculpting and applying this creative and paternalistic gloss: "a person of ordinary intelligence would read the gag order to forbid Appellants from taking this peculiar custody case to the media in a way that would harm the psychological and emotional well-being of Child."[53] If only the order was so limited.

The Majority chooses to interpret the phrase that Mother and Counsel "shall not speak publicly or communicate" about the case as precluding them from speaking to "the media." But that is by no means the only, or even the most intuitive, reading of the trial

---

[51] *Commonwealth v. Davidson*, 938 A.2d 198, 208 (Pa. 2007).

[52] *See Broadrick*, 413 U.S. at 614 ("In such cases, it has been the judgment of the Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted. . . .").

[53] Maj. Op. at 32.

court's prohibition. Certainly, speaking to the media would be speaking publicly about the case. But "communicate" would also bar speaking to *anyone* not connected to the case, including friends or family members. It could also reasonably be read to bar speaking about the case in any public setting. At a minimum, it certainly leaves Mother to wonder to whom she can speak, upon pain of contempt. May Mother speak to the parents of one of Child's school friends who ask about the custody case? May she tell Child's teacher about the outcome of the custody trial in order to anticipate or explain changes to Mother's involvement in the school? May she talk to a friend about the case if she suspects that the friend may share details with others? The fact that it is woefully unclear to whom Mother can or cannot speak about the case demonstrates that the order here is vague. If, as the Majority now maintains, the trial court intended only to preclude Mother from speaking to the press, then the trial court could (and presumably would) have said that. No, the trial court aimed higher and further: it completely precluded Mother from speaking "publicly" as well as "communicat[ing]" at all about its terms. The order is patently unconstitutional.[54]

---

[54] The Majority simply dismisses this constitutional inquiry out of hand, avoiding the cases cited above on the rationale that the gag order at issue here is "nuanced uniquely and tailored to circumvent a specific manner of public speech." Maj. Op. at 22 n. 13. This illustrates the fundamental difference between the Majority's reading of the gag order and my own: I am reading the order that the trial court issued; the Majority is reading the order that it imagines the trial court desired. The Majority chooses to believe that, "when read in context," Mother and Counsel are able to express their views. *Id.* at 23. I do not know whose "context" this is. Indeed, while the Majority finds the order to be "nuanced" and "tailored", the Concurrence recognizes that the order "could potentially be interpreted" as restricting more than the Majority concedes. Conc. Op. at 1. The Majority's charitable view of the order is unsupported by the language of the order itself. We need only read the text of the order itelf — which precludes (with two minor exceptions) "speak[ing] publicly or communicat[ing]" about the case — to discern that the order is overbroad, vague, and a prior restraint.

The Majority acknowledges that Mother and Counsel claimed a violation of Article 1, Section 7 of the Pennsylvania Constitution as well as the First Amendment. The Majority nonetheless rejects that claim because it concludes that Mother and Counsel "have offered no meaningful argument or authority, and this Court has found none, suggesting that Article 1, Section 7 requires the application of a heightened constitutional standard to a content-neutral restriction on a parent's free speech rights."[55] On this point, too, I disagree.

Pennsylvania's Constitution preserves the right to free speech as follows:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

PA. CONST. art. I, § 7.

Reviewing the history of this provision, our Court has stated:

> Apart from the Fourteenth Amendment, the guarantee of free communication of thought and opinion is independently protected by our State Constitution of 1874. Article I, Section 7, P.S., thereof recognizes and declares that 'The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, *being responsible for the abuse of that liberty.*' ([e]mphasis supplied). This provision is a direct inhibition on previous restraint of an exercise of the protected rights and was derived, *ipsissimis verbis,* from Section 7 of Article IX of our State Constitution of 1838 where, in turn, it had been taken from the Constitution of 1790. The members of the Constitutional Convention of 1790 were undoubtedly fully cognizant of

---

[55] Maj. Op. at 33.

the vicissitudes and outright suppressions to which printing had theretofore been subjected in this very Colony.

*William Goldman Theatres, Inc.*, 173 A.2d at 61 (emphasis in original).

Our Court has recognized that, in certain circumstances, the Pennsylvania Constitution provides greater protection than the First Amendment. For example, this Court has found enhanced protection for expressive conduct[56] and for commercial speech.[57] In *Pap's A.M. v. City of Erie*, 812 A.2d 591 (Pa. 2002), this Court rejected the use of intermediate scrutiny and the *O'Brien* factors when expressive conduct was at issue. Instead, we concluded that "[o]ur experience in this case convinces us of the wisdom of our observations in *Insurance Adjustment Bureau* of the perils of the intermediate scrutiny test when protected expression is at issue."[58] We later characterized *Pap's* as holding that "whenever the government acts to effect such a complete ban on a certain type of expression, strict scrutiny must be applied regardless of whether the government's action was content-based."[59]

It does not appear that our Court has addressed the question of whether Pennsylvania's Constitution provides greater protection than the United States Constitution in the particular context before us today. Given the extension of protection and heightened scrutiny that this Court has invoked in past decisions, it appears likely that our Constitution would require application of strict scrutiny to an order like the one

---

[56]  *See Pap's*, 812 A.2d at 612; *Commonwealth v. Tate,* 495 Pa. 158, 432 A.2d 1382, 1391 (1981) (holding that political leafletting on a college campus was protected expression under Article 1, Section 7).

[57]  See *Commonwealth, Bureau of Prof'l & Occupational Affairs v. State Bd. of Physical Therapy,* 728 A.2d 340, 343–44 (Pa. 1999) (holding that advertising is entitled to greater protection if it is not misleading); *Ins. Adjustment Bureau,* 542 A.2d at 1324 (applying a strict scrutiny-type test to restrictions on commercial speech).

[58]  *Pap's*, 812 A.2d at 612.

[59]  *In re Condemnation by Urban Redev. Auth. of Pittsburgh,* 913 A.2d at 189.

before us. However, because I would hold that strict scrutiny applies pursuant to the First Amendment, and because I believe that the instant gag order cannot survive that test, I do not need to resolve the issue pursuant to the Pennsylvania Constitution. It can await another day.

In the meantime, we should dispense with the Majority's straw man argument that "it would be inappropriate for this Court to conclude that [Mother's] First Amendment rights render a trial court in a custody proceeding powerless to safeguard a child from threatened psychological harm stemming from the manner by which a parent delivers his or her speech."[60] The trial court was far from powerless. It merely erred in its use of that power. What does seem "inappropriate" is for this Court to give short shrift to Mother's First Amendment rights. It is not only Mother's right to free speech that is at stake here; it is everyone's. Our decision applies beyond the unusual and troubling facts of this particular case. Today's Majority licenses trial courts to enter vague and overbroad gag orders in any contentious custody case when a judge feels that a parent's speech could be deemed to cause emotional harm. Protection of children from harm is a worthy goal. It can be advanced with a scalpel, rather than a broadsword. It can never be advanced at the expense of our Constitutions and the fundamental rights that they guarantee. The order before us cannot survive strict scrutiny.[61]

I would reverse the lower courts, and I would vacate the gag order. I dissent.

---

[60] Maj. Op. at 28.

[61] While the particular gag order before us is vague, overbroad, and unduly expansive, and accordingly cannot survive strict scrutiny, I do not suggest that all such orders entered in custody cases would meet the same fate. A more narrowly and carefully tailored order could overcome the heavy constitutional burden that prior restraints carry. I agree with the Majority that "[t]he First Amendment does not require" a trial court to shy away from protecting a child from potentially harmful speech. Maj. Op. at 28. But it must do so within the bounds of the First Amendment. Until today, I thought it was well-settled that our Constitution does not countenance gag orders that are vague, overbroad, and cannot satisfy strict scrutiny.

Justice Donohue joins this dissenting opinion.